# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

CYNTHIA BARTON-SPENCER,

        Plaintiff/Counter-Defendant-
        Appellant,

v

FARM BUREAU LIFE INSURANCE
COMPANY OF MICHIGAN, FARM BUREAU
MUTUAL INSURANCE COMPANY OF
MICHIGAN, FARM BUREAU GENERAL
INSURANCE COMPANY OF MICHIGAN,
FARM BUREAU ANNUITY COMPANY OF
MICHIGAN, and COMMUNITY SERVICE
ACCEPTANCE COMPANY,

        Defendants/Counter-Plaintiffs-
        Appellees.

UNPUBLISHED
March 22, 2016

No.   324661
Washtenaw Circuit Court
LC No.   13-000290-NZ

CYNTHIA BARTON-SPENCER,

        Plaintiff/Counter-Defendant-
        Appellant,

v

FARM BUREAU LIFE INSURANCE
COMPANY OF MICHIGAN, FARM BUREAU
MUTUAL INSURANCE COMPANY OF
MICHIGAN, FARM BUREAU GENERAL
INSURANCE COMPANY OF MICHIGAN,
FARM BUREAU ANNUITY COMPANY OF
MICHIGAN, and COMMUNITY SERVICE
ACCEPTANCE COMPANY,

        Defendants/Counter-Plaintiffs-
        Appellees.

No.   325153
Washtenaw Circuit Court
LC No.   13-000290-NZ

-1-

Before: TALBOT, C.J., and WILDER and BECKERING, JJ.

PER CURIAM.

In these consolidated appeals arising out of a contract dispute between plaintiff/counter-defendant, Cynthia Barton-Spencer, and Farm Bureau,[1] Barton-Spencer appeals as of right several rulings that the trial court made at various stages of the lower court proceedings. We affirm in part, reverse in part, and remand for further proceedings in the trial court.

## I. FACTUAL BACKGROUND

Farm Bureau hired Barton-Spencer as a salaried "employee agent" in the spring of 1998. Slightly over a year later, she became an independent agent for Farm Bureau, opening an agency in Whitmore Lake. As an independent agent, Barton-Spencer sold various Farm Bureau insurance products on a commission basis, including life insurance. Her agency relationship with Farm Bureau was governed by a written "agent agreement," which conspicuously noted, in several places, that Barton-Spencer would serve as an independent contractor:

Independent Contractor Relationship

The [Farm Bureau] Companies believe that insurance agents who operate as independent contractors are best able to provide the creative selling, professional counseling, and prompt, skillful service essential to the creation and maintenance of successful multiple line insurance companies and agencies. The Companies do not seek, and will not assert, control over the Agent's daily activities, provided that the Agent does not violate applicable laws or any terms of this Agreement or any agreement or guidelines ancillary to this Agreement. The Companies expect the Agent to exercise his/her own judgment as to the time, place, and manner of soliciting insurance, servicing Michigan Farm Bureau Members and Farm Bureau Insurance policyholders and otherwise carrying out the provisions of this Agreement.

\* \* \*

A. Agent's Authority.

\* \* \*

4. Principal Occupation. The fulfillment of this Agreement shall be the Agent's principal occupation.

\* \* \*

---

[1] For the sake of clarity, we refer to the defendants/counter-plaintiffs collectively as Farm Bureau.

-2-

C.    Independent Contractor.

1.    The Agent acknowledges that he/she is an independent contractor for all purposes and situations governed by this Agreement.  The relationship between the Agent and the Companies created by this Agreement shall be governed by those rules and laws governing the status of and relationships with independent contractors and not those rules and laws governing employer-employee relationships.  Accordingly, the Agent has full control of his/her daily activities, with the right to exercise independent judgment as to the time, place, and manner of soliciting insurance, servicing policyholders, and otherwise carrying out the provisions of this Agreement.

* * *

D.    Agent's Responsibilities.    The Agent agrees to comply with the Companies' rules and regulations pertaining to the policies and products covered by this Agreement; provided, however, that such rules and regulations shall not interfere with the Agent's status as an independent contractor.

The agent agreement also set forth the manner of Barton-Spencer's compensation and specified how the parties could terminate the agreement:

G.    Compensation.    The Companies shall pay the Agent commissions and bonuses only as set forth in the applicable Agent Compensation Schedule. . . . Farm Bureau [] has the right, in its sole discretion, to modify the Agent Compensation Schedules.  Notice of any such modification shall be provided to the Agent.

* * *

2.    Commissionable Premiums.  Commissionable premiums shall consist of only those premiums which are collected and retained by Farm Bureau [] on business personally produced by or assigned to the Agent.  If, after a contract of insurance is issued and the commission is paid, the contract is changed to include a different plan of insurance or the premium paid on the contract of insurance is refunded for any reason, the Companies shall have the right to determine what, if any, change in commission is required and the Agent shall have such amount deducted from commissions.

3. First Lien.  The Companies shall have first lien on all commissions or other compensation due, or to become due, to the Agent in discharge of any indebtedness owing to the Companies by the Agent.

4.    Commission Deduction Authorization.  The Agent agrees that the Companies may deduct from the Agent's commissions; bonuses, and other compensation, all indebtedness or obligations which the Agent owes to the Companies and/or which the Agent has obligated the Companies to pay.  Such indebtedness or obligations shall include, but shall not be limited to, any debts

incurred by the Agent as a result of a New Agent Finance Plan Agreement and any fees charged to the Agent as a result of the Companies' rules or regulations.

\* \* \*

I.      Termination of Agreement.

1.      Notice of Termination.  The Companies or the Agent may terminate this Agreement at any time, with or without cause, by giving notice of termination, in writing, to the other party.  Notice of termination need not include the reason or reasons, if any, for such termination.  The date of termination shall be the date specified in the notice or, if no date is specified, the date of termination shall be the date of delivery if the notice is delivered or the date of the postmark if the notice is mailed.

Finally, the agent agreement provided that, in the event of litigation arising out of the parties' agreement, Farm Bureau could, under certain circumstances, seek to recover its attorney fees and costs from Barton-Spencer:

L.      Miscellaneous.

\* \* \*

5.      Attorneys Fees and Costs.  If the Companies are successful in any suit or proceeding against the Agent brought to enforce any provision of this Agreement, or brought to establish damages sustained by the Companies as a result of the Agent's violation of any provision of this Agreement, the Agent agrees to reimburse the Companies' attorney fees and costs as may be fixed by the court in which such suit or proceeding is brought.

Barton-Spencer continued to work at the Whitmore Lake agency for roughly 13 years. Her initial "book" of yearly premiums from established clients was between $200,000 and $300,000, but over time she increased that figure to more than $800,000.

In 2010, representatives of Farm Bureau contacted Barton-Spencer to see if she was interested in leaving her Whitmore Lake agency to take over another established agency in Manchester, Michigan.  To sweeten the deal, Farm Bureau promised that, if she changed agencies, Barton-Spencer would continue to receive commissions on $200,000 of the Whitmore Lake "book," plus the commissions she would earn on the Manchester agency's established book of $1.1 million, for a total book of $1.3 million.  Thus, on November 1, 2010, Barton-Spencer left her former location and took charge of the Manchester agency.  But for the first four months after she changed agencies, Barton-Spencer did not receive the promised commission payments on the $200,000 of the Whitmore Lake book, which amounted to unpaid commissions of approximately $6,666.

Among the Farm Bureau products Barton-Spencer sold at the Manchester agency were "[s]ingle premium whole life [(SPWL)] policies"—a type of "modified endowment contract"— which generate dividends and interest during the policyholder's life, and ultimately yield a "tax-

free death benefit." Unlike a traditional life insurance policy, which has continuing premium payments over time, an SPWL policy is funded at the outset with the payment of a single, lump-sum premium. When she sold an SPWL policy, Barton-Spencer received a one-time commission of 5% of the premium that was generated. She actively marketed the policies to her clients, characterizing them as "a great product."

Relevant to this appeal and with regard to SPWL policies, Barton-Spencer perceived a continuing "debate" about the tax consequences of funding an SPWL policy with money transferred from a "qualified plan" account, i.e., an account receiving tax-deferred treatment under the Internal Revenue Code (IRC), such as a 401(k) or an Individual Retirement Account (IRA). In 2011 and 2012 Barton-Spencer sold several policies to clients who funded their policies with qualified plan money despite knowing that using "qualified plan" money to fund an SPWL policy might result in a taxable transfer under the IRC. Instead, Barton-Spencer informed such clients that the transfers would be "honored" as nontaxable by the Internal Revenue Service so long as the clients' tax returns were handled "properly."

Eventually, an outside professional who shared a common client with Barton-Spencer contacted Farm Bureau and voiced concerns about the tax consequences of such transactions. After auditing several of Barton-Spencer's files, Farm Bureau began an investigation into the transactions. At the conclusion of its investigation, Farm Bureau gave Barton-Spencer written notice that it was terminating her agent agreement for cause:

> [Y]our Agent Agreement is hereby terminated effective today, February 4, 2013[.]
>
> * * *
>
> [T]here are reasons for this termination, which relate to sales of [SPWL] policies. The [Farm Bureau] Companies investigated policies sold by you and found a pattern of tax advice to purchasers that the purchases funded by transfers of funds from IRAs or other qualified plans could be used to purchase the policies with no taxable event whereas the policyholders were subject to taxation. The resulting business practices violate Michigan Insurance laws and rules and regulations of the Companies in ways that include statements misrepresenting non-taxable advantages of policies that actually resulted in policyholders being subject to taxation, with accompanying misrepresentations that rollovers or transfers from other financial institutions were to IRAs of Farm Bureau Life Insurance Company of Michigan, when the funds were to be used to purchase policies that were not qualified plans.
>
> The Companies have concluded that the business practices of your agency are not acceptable, and the net effect is to not have the level of service required by your Agent Agreement, rules and regulations, and Michigan Insurance Laws.

Under the "Agent Commission Schedule" that was in effect at the time of termination, upon termination of the agent agreement, Barton-Spencer would ordinarily have been entitled to "extended earnings"—the continued payment, over a certain period, of a portion of her pre-

termination commissions.  At Farm Bureau's option, however, such extended earnings could be terminated

> if the Agent violates any rule or regulation of any of the [Farm Bureau] Companies, fails to comply with any of his/her obligations under his/her Agent Agreement or Agent Employment Agreement, as the case may be, commits and/or is convicted of a criminal act against any of the Companies, violates any regulation of the Michigan Insurance Bureau, and/or violates a Michigan Insurance Law.

In its termination letter to Barton-Spencer, Farm Bureau informed her that, given its conclusion that her sales practices constituted "violations of [Farm Bureau] rules and regulations . . . the Agent Agreement, and Michigan Insurance Laws," it deemed her ineligible to receive extended earnings.  At the time of termination, however, Barton-Spencer had already received her commissions on the premiums for the sale of the SPWL policies over which Farm Bureau terminated her agent agreement.

## II.  PROCEDURAL BACKGROUND

The month after she was terminated, Barton-Spencer filed a four-count complaint against Farm Bureau alleging: (1) breach of contract based on Farm Bureau's refusal to pay extended earnings; (2) failure, for four months, to pay her the promised commissions on the Whitmore Lake "book," and requesting an accounting thereof; (3) age discrimination in violation of the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*; and (4) violation of Michigan's Consumer Protection Act (CPA), MCL 445.901 et seq.  Barton-Spencer demanded a jury trial on "all issues in this cause unless expressly waived."  In its answer, Farm Bureau relied on Barton-Spencer's jury demand.

Roughly six months later, Farm Bureau filed a motion for summary disposition under MCR 2.116(C)(10).  In pertinent part, Farm Bureau argued that Barton-Spencer's ELCRA and CPA claims were fatally flawed because she was an independent contractor, not a Farm Bureau employee, and as such she lacked the ability to assert such claims against Farm Bureau.  The trial court agreed, granting Farm Bureau summary disposition of the ELCRA and CPA claims.

The next day, Barton-Spencer filed an amended complaint, which added a claim of defamation per se.  She relied on her previously filed jury demand.  Farm Bureau subsequently sought and was granted summary disposition regarding the defamation claim.

Along with its answer to Barton-Spencer's amended complaint, Farm Bureau included a four-count counterclaim, only two of which are relevant to our instant analysis.  Among its general allegations, Farm Bureau alleged that (1) Barton-Spencer's "actions"—i.e., her sales practices regarding SPWL policies—"failed to comply with [her] obligations under the Agent Agreement," (2) she "gave tax advice in violation of [Farm Bureau's] rules and regulations, and moreover, the tax advice [she] provided . . . to customers was false and was [given] with the purpose of inducing customers to use their tax-deferred retirement funds to purchase Farm Bureau SPWL policies so that plaintiff could receive commissions on those sales," and (3) that Barton-Spencer persisted in such practices even after she was aware of the tax implications.  The

first counterclaim sought the return of $42,592.07 in commissions that were paid to Barton-Spencer on SPWL policies that Farm Bureau subsequently refunded to customers. Farm Bureau alleged that, because the premiums supporting such commissions had been refunded, Barton-Spencer was unentitled to the commissions, was "liable to return [them] to Farm Bureau," and "would be unjustly enriched if . . . not required to return the commissions[.]" In the second counterclaim, Farm Bureau sought to recover from Barton-Spencer, under the terms of the agent agreement, its "attorney fees and costs in connection with this action."

In response to Farm Bureau's counterclaims, Barton-Spencer filed, among other motions, a motion to strike Farm Bureau's counterclaims. She argued that, with just slightly more than a month before the scheduled end of discovery, she would have insufficient time to conduct discovery regarding the counterclaims. In the alternative, Barton-Spencer argued that Farm Bureau should be required to present a more definite statement regarding the nature of its counterclaims. At the subsequent motion hearing, Barton-Spencer made another alternative argument, orally requesting additional time for discovery. Reasoning that trial was scheduled to begin in less than two months, and that it had already granted several adjournments, the trial court held that no extension of the discovery dates would be permitted, and that the parties would simply have to "accommodate each other with regard to [] discovery[.]" After taking the matter under advisement, the trial court ultimately denied Barton-Spencer's motion to strike the counterclaims.

Three days before the jury trial began, Barton-Spencer filed a motion seeking a "directed verdict" regarding Farm Bureau's counterclaims. In support, she argued that the counterclaim was an improper claim for unjust enrichment based on the agent agreement, not a claim for breach of that agreement. Additionally, Barton-Spencer contended that, under the plain language of the agent agreement, she had no obligation to return the commissions on which Farm Bureau's first counterclaim was premised. Farm Bureau filed a response, arguing that its counterclaim to recover such commissions was for breach of contract, not unjust enrichment. Farm Bureau also argued that Barton-Spencer's motion was not a proper motion for a directed verdict but was, instead, a "disguised motion" for summary disposition under MCR 2.116(C)(8), which was filed long after the deadline set for such motions by the scheduling order. Because the jury trial had already commenced at the time Farm Bureau filed its response, the trial court did not initially entertain argument on the matter. Rather, Barton-Spencer's motion for a directed verdict was argued on the final day of the trial. At that time, the trial court denied the motion, reasoning that Farm Bureau's counterclaim was "clearly" for breach of the agent agreement and that sufficient evidence had been presented for a rational trier of fact to find in Farm Bureau's favor.

At the conclusion of the five-day trial, the jury returned a verdict indicating that (1) Barton-Spencer's "actions in connection with the sale of [SPWL] policies" contravened a "rule or regulation of Farm Bureau," the terms of the agent agreement, or "Michigan insurance law," (2) accordingly, Barton-Spencer was not entitled to extended earnings, (3) with regard to its counterclaim, Farm Bureau was entitled to recover $49,027.64 from Barton-Spencer in commissions she had been paid for SPWL policies that had subsequently been refunded, and (4) conversely, Barton-Spencer was entitled to recover $6,666.66 for the commissions Farm Bureau failed to pay her in the first four months after she moved to the Manchester agency. Farm Bureau's counterclaim seeking costs and attorney fees under the agent agreement was not submitted to the jury.

-7-

Instead, Farm Bureau filed a postjudgment motion seeking such costs and attorney fees. In her response, Barton-Spencer objected, arguing that she was entitled to a jury trial regarding the reasonableness of the attorney fees sought. Without expressly deciding whether Barton-Spencer was entitled to a jury trial, the court granted Farm Bureau's motion, concluding that the attorney fees sought by Farm Bureau were reasonable when reduced by 30%. Thus, the trial court awarded Farm Bureau attorney fees of $40,157.25, plus costs of $9,341.81, for a total award of $49,499.06.

After it was granted those contractual costs and fees, Farm Bureau filed a motion seeking its actual costs in the action—including attorney fees incurred since the trial court's previous order—as case evaluation sanctions under MCR 2.403(O). Reasoning that Barton-Spencer "failed to obtain a verdict more favorable to her than case evaluation," whereas Farm Bureau "did obtain a more favorable verdict," the trial court decided that Farm Bureau was entitled to its actual costs under MCR 2.403(O). Noting its previous order regarding contractual attorney fees, and deducting any "overlap" of such fees already awarded, the trial court granted Farm Bureau an additional $32,242.50 in attorney fees.

III. ANALYSIS

A. STANDARDS OF REVIEW

Barton-Spencer raises numerous claims of error on appeal, thereby implicating numerous standards of review. We review de novo a trial court's ruling on a motion for summary disposition, *Johnson v Pastoriza*, 491 Mich 417, 428; 818 NW2d 279 (2012), its decision regarding a motion for a directed verdict, *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 497 Mich 337, 345; 871 NW2d 136 (2015), any issues of statutory interpretation, including the proper interpretation of the ELCRA, *Elezovic v Ford Motor Co*, 472 Mich 408, 418; 697 NW2d 851 (2005), issues of constitutional law, *Brooks Williamson & Assoc, Inc v Mayflower Const Co*, 308 Mich App 18, 32; 863 NW2d 333 (2014) (citation omitted), "[t]he existence and interpretation of a contract," *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006), and "the proper interpretation and application of a court rule," *Hanton v Hantz Fin Servs, Inc*, 306 Mich App 654, 661; 858 NW2d 481 (2014).

> In reviewing a trial court's decision on a motion for summary disposition pursuant to MCR 2.116(C)(10), this Court considers the affidavits, pleadings, depositions, admissions, and documentary evidence submitted by the parties in the light most favorable to the nonmoving party. A motion for summary disposition under MCR 2.116(C)(10) should be granted if, there being no genuine issue of material fact, the moving party is entitled to judgment as a matter of law. [*Radina v Wieland Sales, Inc*, 297 Mich App 369, 372-373; 824 NW2d 587 (2012) (citations omitted).]

With regard to summary disposition, our review of the record is limited "to the evidence presented to the trial court at the time [the] motion was decided." *Peña v Ingham Co Rd Comm*, 255 Mich App 299, 313; 660 NW2d 351 (2003).

On the other hand, we review the trial court's decisions regarding discovery for an abuse of discretion. *Shinkle v Shinkle (On Rehearing)*, 255 Mich App 221, 224; 663 NW2d 481 (2003). "A trial court abuses its discretion when its decision falls outside the range of principled outcomes." *King v Mich State Police Dep't*, 303 Mich App 162, 175; 841 NW2d 914 (2013).

## B. AGE DISCRIMINATION UNDER THE ELCRA

On appeal, Barton-Spencer does not argue, as she did in the trial court, that she was an "employee" of Farm Bureau under the "economic reality test," rather than an independent contractor. See generally *Ashker ex rel Estate of Ashker v Ford Motor Co*, 245 Mich App 9, 12-16; 627 NW2d 1 (2001) (noting that the economic reality test is used to determine whether an employer-employee relationship exists under the ELCRA). Instead, she contends that the trial court erred when it decided that the viability of her ELCRA claim was entirely dependent on her status as a Farm Bureau employee.[2] We agree that the trial court erred but, because it nevertheless reached the right result, reversal is unwarranted.

In considering Farm Bureau's motion for summary disposition regarding the ELCRA claim, the trial court determined that Barton-Spencer was an independent contractor, not a Farm Bureau employee. On that basis, the trial court granted Farm Bureau summary disposition. It reasoned that, absent a direct employer-employee relationship, Barton-Spencer could not pursue an ELCRA claim against Farm Bureau.

By so ruling, the trial court erred. Oftentimes, liability under the ELCRA is premised on the existence of an employer-employee relationship. See *id.* Indeed, in pertinent part, MCL 37.2202(1) provides, "An *employer* shall not. . . . Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age[.]" (Emphasis added.) But as our Supreme Court explained in *McClements v Ford Motor Co*, 473 Mich 373, 386-387; 702 NW2d 166 (2005), amended 474 Mich 1201 (2005),[3] the existence of an employer-employee relationship is not a prerequisite to recovery under the ELCRA:

> [A]n employer is liable under the [EL]CRA when it utilizes a prohibited characteristic in order to adversely affect or control an individual's employment or potential employment. Thus, the key to liability under the [EL]CRA is not simply the status of an individual as an "employee"; rather, liability is contingent upon the employer's affecting or controlling that individual's work status.

---

[2] Because Barton-Spencer did not raise this precise issue in the trial court, it is unpreserved. See *Hines v Volkswagen of Am, Inc*, 265 Mich App 432, 443; 695 NW2d 84 (2005). We nevertheless exercise our discretion to review it "because it is an issue of law regarding which all the relevant facts have been presented." See *Breighner v Mich High Sch Athletic Ass'n, Inc*, 255 Mich App 567, 578; 662 NW2d 413 (2003).

[3] Since *McClements* was decided, MCL 37.2202 was amended in ways that are not germane to the instant analysis. See 2009 PA 190.

Accordingly, an employer can be held liable under the [EL]CRA for discriminatory acts against a nonemployee if the nonemployee can demonstrate that the employer affected or controlled a term, condition, or privilege of the nonemployee's employment.[10]

---

[10] For example, a secretary who works for a temporary employment agency might not be an "employee" at the office where she is sent to fill in. However, there is little question that the employer at that office would dictate a term, condition, or privilege of her employment with the temporary employment agency, at least during the pendency of her temporary employment.

Here, the terms of the agent agreement and the agent commission schedule clearly establish that Farm Bureau "affected or controlled a term, condition, or privilege of [Barton-Spencer's] employment[.]"[4] See *id.* at 385. Therefore, contrary to the trial court's ruling, Barton-Spencer was not precluded as a matter of law, from pursuing a claim, if viable, under the ELCRA.

Even so, reversal is unwarranted because the trial court reached the right result, albeit it for the wrong reason. See *Hoffenblum v Hoffenblum*, 308 Mich App 102, 114; 863 NW2d 352 (2014). To establish an ELCRA claim using indirect or circumstantial evidence of discriminatory animus, a plaintiff must establish a prima facie case by "present[ing] evidence that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) her failure to obtain the position occurred under circumstances giving rise to an inference of unlawful discrimination." *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 134; 666 NW2d 186 (2003). A prima facie case "creates a presumption of unlawful discrimination," i.e., a presumption that there is "a causal link between the discriminatory animus and the adverse employment decision." *Id.* at 134-135. Once the plaintiff establishes a prima facie case, "the burden [] shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 134. If the "defendant produces such evidence, the presumption is rebutted, and the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination." *Id.*

A plaintiff can establish that a defendant's articulated legitimate, nondiscriminatory reasons are pretexts (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual

---

[4] Aside from the fact that the agent agreement gave Farm Bureau authority to terminate the agency relationship "at any time, with or without cause," it also (1) obligated Barton-Spencer "to comply with [Farm Bureau's] rules and regulations pertaining to the policies and products covered" by the agreement, (2) permitted Farm Bureau to fine Barton-Spencer for violations of such rules and regulations and to deduct such fines from her commissions, bonuses, and other compensation, and (3) afforded Farm Bureau "the right, in its sole discretion, to modify the Agent Compensation Schedules." Indeed, under the agent commission schedule, Farm Bureau also had the power to unilaterally terminate Barton-Spencer's extended earnings, as it eventually did.

factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision. [*Feick v Monroe Co*, 229 Mich App 335, 343; 582 NW2d 207 (1998).]

"Mere speculation or conjecture is insufficient to establish reasonable inferences of causation." *Sniecinski*, 469 Mich at 140.

There is insufficient evidence on this record for plaintiff to have sustained a claim of discrimination against Farm Bureau, and therefore, summary disposition of Barton-Spencer's ELCRA claim was proper. First, she did not establish the fourth element for a prima facie case. Although Barton-Spencer presented evidence that the Farm Bureau agent who replaced her was 16 years younger than Barton-Spencer, she failed to produce any evidence that age was a factor in Farm Bureau's termination decision. "While a plaintiff is not required to show circumstances giving rise to an inference of discrimination in any one specific manner, the plaintiff's burden of production remains to present evidence that the employer's actions, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Hazle v Ford Motor Co*, 464 Mich 456, 470-471; 628 NW2d 515 (2001) (quotation marks and citation omitted). Because Barton-Spencer failed to produce such evidence, she failed to establish a prima facie case of age discrimination under the ELCRA.

Second, even if Barton-Spencer had established a prima facie case, she failed to produce evidence to rebut the legitimate, nondiscriminatory reason that Farm Bureau articulated for terminating the agent agreement. Farm Bureau's justification for terminating Barton-Spencer was that Barton-Spencer persisted in falsely advising clients that they could fund SPWL policies using "qualified plan" funds without incurring tax liability. It is immaterial whether such funding *actually* creates tax liability. The germane inquiry is whether Farm Bureau was motivated by discriminatory animus, "not whether [its decision was] wise, shrewd, prudent, or competent." See *id.* at 476 (citation omitted). Nevertheless, Barton-Spencer failed to produce sufficient evidence to create a genuine issue of material fact on the question whether Farm Bureau's stated reason was a pretext. She provided no evidence (1) that Farm Bureau's given reason for terminating the agreement lacked any factual basis, (2) that such stated basis was not an actual factor motivating Farm Bureau's ultimate decision, or (3) that the stated reason was a factor in the decision, but was insufficient to justify Farm Bureau's decision.

## C. FARM BUREAU'S COUNTERCLAIMS

Barton-Spencer presents four distinct claims of error regarding Farm Bureau's counterclaims. We address each in turn.

## 1. SUFFICIENCY OF PLEADING

Barton-Spencer argues that the trial court erred by denying her motion for a "directed verdict" regarding Farm Bureau's first counterclaim. Specifically, Barton-Spencer argues that the trial court erred by failing to recognize that, on the face of the pleadings, the counterclaim was an improper claim for unjust enrichment based on the agent agreement, not a claim for breach of that agreement. We disagree.

Although it was argued on the final day of the jury trial, Barton-Spencer's motion for a "directed verdict" was filed three days *before* the trial commenced. Thus, it was actually a motion for summary disposition, not for a directed verdict. Compare MCR 2.116(B)(1) ("A party may move for dismissal of or judgment on all or part of a claim in accordance with this rule.") and MCR 2.516 ("A party may move for a directed verdict at the close of the evidence offered by an opponent.").

"Michigan is a notice-pleading state." *Johnson v QFD, Inc*, 292 Mich App 359, 368; 807 NW2d 719 (2011). A counterclaim is a pleading, MCR 2.110(A), and must be supported by "[a] statement of the facts, without repetition, on which the pleader relies in stating the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend," MCR 2.111(B)(1). "[I]t is well settled that we will look beyond mere procedural labels and read the complaint as a whole when ascertaining the exact nature" of a claim. *Johnson*, 292 Mich App at 368.

Viewed as a whole, within the context of the entire pleading, Farm Bureau's counterclaim was stated with sufficient specificity to reasonably inform Barton-Spencer of its nature as a claim for breach of contract. Indeed, in its general allegations section, the counterclaim specifically alleges that Barton-Spencer's "actions"—i.e., her sales practices regarding SPWL policies—"failed to comply with [her] obligations under the Agent Agreement[.]" Hence, the trial court did not err by concluding that Farm Bureau's counterclaim was supported by sufficient allegations to reasonably inform Barton-Spencer of its nature.

## 2. INTERPRETATION OF THE AGENT AGREEMENT

Barton-Spencer also argues that, even assuming, arguendo, that Farm Bureau's counterclaim was stated sufficiently to satisfy MCR 2.111(B)(1), the trial court should have granted her a directed verdict regarding that counterclaim. In support, Barton-Spencer argues that the trial court should have decided as a matter of law that, under the plain language of the agent agreement, Barton-Spencer's retention of the contested premiums (for the sale of SPWL policies) did not constitute a breach of the agent agreement. We disagree.

"The primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Rasheed v Chrysler Corp*, 445 Mich 109, 127 n 28; 517 NW2d 19 (1994). To discern that intent, this Court "examin[es] the language of the contract according to its plain and ordinary meaning." *Miller-Davis Co v Ahrens Const, Inc (After Remand)*, 495 Mich 161, 174; 848 NW2d 95 (2014). If the parties have "several agreements relating to the same subject matter," their intention "must be gleaned from all the agreements." *Omnicom of Mich v Giannetti Inv Co*, 221 Mich App 341, 346; 561 NW2d 138 (1997). "[E]very word, phrase, and clause" must be given effect, and constructions "that would render any part of the contract surplusage or nugatory" must be avoided. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003). "A contract is patently ambiguous only if, after the court has engaged in its judicial duties of giving effect to the contract's language, the court concludes that a term is equally susceptible to more than a single meaning, or that two provisions of the same contract irreconcilably conflict with each other[.]" *Shay v Aldrich*, 487 Mich 648, 678; 790 NW2d 629, 646-47 (2010) (quotation marks and citations omitted). "[T]he meaning of an

-12-

ambiguous contract is a question of fact" that must be resolved by the fact-finder. *Klapp*, 468 Mich at 469.

At the time Farm Bureau terminated her agent agreement, Barton-Spencer had already received her commissions on the sale of the SPWL policies for which she was terminated. Farm Bureau's counterclaim sought to recover such commissions from Barton-Spencer based on the language of the agent agreement, particularly the following provisions:

G.    <u>Compensation</u>.

* * *

2.    Commissionable Premiums. Commissionable premiums shall consist of only those premiums which are collected *and retained* by Farm Bureau [] on business personally produced by or assigned to the Agent. If, after a contract of insurance is issued and the commission is paid, the contract is changed to include a different plan of insurance *or the premium paid on the contract of insurance is refunded for any reason*, the Companies shall have the right to determine what, if any, change in commission is required and the Agent *shall have such amount deducted from commissions*.

3.  First Lien. The Companies shall have first lien on all commissions or other compensation due, or to become due, to the Agent in discharge of any indebtedness owing to the Companies by the Agent.

4.  Commission Deduction Authorization. The Agent agrees that the Companies may *deduct* from the Agent's commissions; bonuses, and other compensation, all indebtedness or obligations which the Agent owes to the Companies and/or which the Agent has obligated the Companies to pay. Such indebtedness or obligations shall include, but shall not be limited to, any debts incurred by the Agent as a result of a New Agent Finance Plan Agreement and any fees charged to the Agent as a result of the Companies' rules or regulations. [Emphasis added.]

Barton-Spencer argues that the language above permitted Farm Bureau to deduct refunded commissions from any *future* commission payments it owed Barton-Spencer, but it did not obligate Barton-Spencer to return any commissions *already paid* to her, even if the premiums supporting such commissions were later refunded.

In analyzing this point, the trial court concluded that the parties' intent was a question of fact for the jury to decide, thereby implicitly deciding that the language of the contract was patently ambiguous. We agree.

Barton-Spencer is correct that the plain language of the agent agreement is silent about whether she was entitled to retain paid commissions that were refunded after she was terminated. But the contract's silence in that regard does not render it unambiguous. Under the agreement, "commissionable premiums" are "only" those that are both "collected and retained" by Farm Bureau. It is undisputed that the premiums at issue here were refunded; hence, Farm Bureau did

not retain them. Because Farm Bureau did not retain such premiums, they do not qualify as "commissionable" premiums. In other words, Barton-Spencer had no right to *receive* a commission on those premiums under the parties' agreement, but it is silent about whether she was obligated to *return* those commissions to Farm Bureau under the circumstances at bar. Given the dichotomy between, on the one hand, the contract's silence about the return of previously paid commissions that are later refunded, and, on the other hand, its qualification that premiums are only commissionable if they are retained by Farm Bureau, the contract is patently ambiguous; it is equally subject to more than one reasonable interpretation. Consequently, it was appropriate for the trial court to submit this issue to the jury for resolution at trial, and Barton-Spencer's instant claim of error merits no relief. See *Klapp*, 468 Mich at 469.

### 3. ADEQUACY OF DISCOVERY

Barton-Spencer also argues that the trial court erred by failing to grant her pretrial motion for additional discovery regarding the counterclaim, and by failing to grant her postjudgment motion for a new trial, which was premised on the purported inadequacy of discovery. We disagree.

Although "Michigan has a broad discovery policy that permits the discovery of any matter that is not privileged and that is relevant to the pending case," our "court rules acknowledge the wisdom of placing reasonable limits on discovery." *Alberto v Toyota Motor Corp*, 289 Mich App 328, 336; 796 NW2d 490 (2010). A trial court's discovery ruling is only a basis for reversal where the trial court committed error that actually prejudiced the appellant. *In re Forfeiture of $1,159,420*, 194 Mich App 134, 141; 486 NW2d 326 (1992), citing MCR 2.613(A).

Barton-Spencer argues that, because Farm Bureau's counterclaim was asserted just over a month before the end of discovery, and the trial court refused to grant her additional discovery regarding the counterclaim, she "was compelled to proceed to trial without meaningful discovery on the [] counterclaim," which resulted in "potential prejudice." But she fails to cite evidence of any actual prejudice, to explain why one month of discovery was inadequate—despite the extensive discovery conducted earlier in the case regarding claims based on the same contract— or to specify what additional discovery she would have conducted had she been afforded additional time. Thus, Barton-Spencer's instant claim of error necessarily fails. See *id.*; see also *In re TK*, 306 Mich App 698, 712; 859 NW2d 208 (2014) ("A party cannot simply assert an error or announce a position and then leave it to this Court to discover and rationalize the basis for her claims, or unravel and elaborate for her her argument, and then search for authority either to sustain or reject her position.") (quotation marks, brackets, and citation omitted).

### 4. CONTRACTUAL ATTORNEY FEES

Finally, Barton-Spencer argues that the trial court erred by granting Farm Bureau contractual attorney fees after Farm Bureau failed to adduce evidence supporting the reasonableness of such fees at trial. She contends that, because the trial court decided the issue based on evidence presented after the jury trial, she "was denied her right to have this issue decided by the jury." We agree.

"Michigan generally follows the 'American rule' regarding attorney fees, which provides that fees are not generally recoverable unless a statute, court rule, or common-law exception provides otherwise." *Silich v Rongers*, 302 Mich App 137, 147-148; 840 NW2d 1 (2013). Exceptions to that general rule must be narrowly construed. *Fleet Bus Credit v Krapohl Ford Lincoln Mercury Co (After Remand)*, 274 Mich App 584, 589; 735 NW2d 644 (2007) (*Fleet*). However, "[t]he parties to a contract may include a provision that the breaching party will be required to pay the other side's attorney fees and such provisions are judicially enforceable." *Zeeland Farm Servs, Inc v JBL Enterprises, Inc*, 219 Mich App 190, 195; 555 NW2d 733 (1996) (*Zeeland*). "Attorney fees awarded under contractual provisions are considered damages, not costs." *Central Transp, Inc v Fruehauf Corp*, 139 Mich App 536, 548; 362 NW2d 823 (1984); see also *Fleet*, 274 Mich App at 590-592 (holding that such attorney fees are general damages, not special damages).

"In order to obtain an award of attorney fees as damages under a contractual provision requiring such a payment, the party seeking payment must sue to enforce the fee-shifting provision, as it would for any other contractual term." *Pransky v Falcon Group, Inc*, 311 Mich App 164, 194; ___ NW2d ___ (2015). Farm Bureau did so in its counterclaim, specifically stating a cause of action to recover attorney fees under the agent agreement. However, because "recovery is limited to *reasonable* attorney fees," "[a] party claiming the right to recover attorney fees under a contract must introduce evidence of the reasonableness of the attorney fees to establish a prima facie case[.]" *Zeeland*, 219 Mich App at 195-196 (emphasis added).

Although Farm Bureau adduced evidence to support the reasonableness of its claimed attorney fees, it did so in postjudgment motion proceedings before the trial judge, not during the jury trial. Barton-Spencer objected, arguing that she was entitled to a jury trial regarding the reasonableness of the attorney fees sought. Without deciding whether Barton-Spencer was entitled to a jury trial, the trial court nevertheless granted Farm Bureau's motion.

By doing so, the trial court erred. Barton-Spencer demanded a jury trial on *all* issues so triable. "A right to a jury trial can exist either statutorily or constitutionally." *Madugula v Taub*, 496 Mich 685, 696; 853 NW2d 75 (2014). Article 1, § 14 of Michigan's 1963 Constitution provides, "The right of trial by jury shall remain, but shall be waived in all civil cases unless demanded by one of the parties in the manner prescribed by law." Under the above provision, a party in a civil case has a constitutional right to a jury trial "[i]f the nature of the controversy would have been considered legal at the time the 1963 Constitution was adopted," but no such right exists "if the nature of the controversy would have been considered equitable[.]" *Madugula*, 496 Mich at 705-706. "[W]e must consider the relief sought as part of the nature of the claim to determine whether the claim would have been denominated equitable or legal at the time the 1963 Constitution was adopted." *Id.* at 706.

The contractual attorney fees sought by Farm Bureau were damages, see *Fleet*, 274 Mich App at 590-592, and "claims for money damages were generally considered legal in nature at the time the 1963 Constitution was adopted," *Madugula*, 496 Mich at 713. Moreover, our Courts have long recognized, in cases decided both before 1963 and afterward, that "[a]n action for damages for a breach of contract is historically an action at law, not in equity." See, e.g., *Stroud v Glover*, 120 Mich App 258, 261; 327 NW2d 462 (1982), citing *Reith v Univ Housing Corp*, 247 Mich 104, 108; 225 NW 528 (1929). Furthermore, settled precedent indicates that the

-15-

reasonableness of the contractual fees sought is a question that may be properly decided by a jury. *Zeeland*, 219 Mich App at 199. Thus, we conclude that Barton-Spencer was entitled to have the issue decided by a jury rather than the trial court.

That conclusion, however, does not end our analysis. Farm Bureau argues that, under the plain language of the agent agreement, the amount of recoverable attorney fees and costs was to "be fixed by the court in which [the] suit or proceeding [wa]s brought," i.e., by the trial court. Thus, Farm Bureau argues that Barton-Spencer agreed to have the amount of attorney fees and costs judicially determined, thereby effectively waiving any right to a jury trial on the issue.

The right to a jury trial "cannot be forfeited by any means short of waiver[.]" *Walters v Nadell*, 481 Mich 377, 384 n 14; 751 NW2d 431 (2008) (citation omitted). Such a waiver can be effectuated by contract. *Morris v Metriyakool*, 418 Mich 423, 441; 344 NW2d 736 (1984); see also *In re Nestorovski Estate*, 283 Mich App 177, 193; 769 NW2d 720 (2009) (citation omitted). However, "[a]bsent an *express* waiver, a trial court, after a jury demand, must honor the right to a jury trial with respect to damages." *Prentis Family Foundation v Barbara Ann Karmanos Cancer Institute*, 266 Mich App 39, 54; 698 NW2d 900 (2005) (emphasis added), see also *Mink v Masters*, 204 Mich App 242, 247; 514 NW2d 235 (1994) ("[A]bsent an express waiver by defendants of the right to a jury trial, the trial court was obligated to honor defendants' right to a jury trial on the issue of damages. The trial court, therefore, erred in conducting a hearing instead of a jury trial on the issue of damages.").

We conclude that the provision indicating that Farm Bureau's contractual costs and attorney fees would be "fixed by the court" was not an express waiver of Barton-Spencer's right to a jury trial on such damages. Because juries have the power to decide issues but lack authority to enter orders or judgments, *all* judgments of a trial court are eventually "fixed" by the court, even those following a jury trial. Thus, the "fixed by the court" language renders the contract ambiguous on the question whether the parties intended to have the reasonableness of contractual attorney fees decided by the trial court rather than a jury. By its very nature, such ambiguous language cannot constitute an "express" waiver. Given the constitutional right at issue, and the fact that the agent agreement fails to expressly mention that right—indeed, the agreement contains neither the word "jury," the phrase "jury trial," nor any form of the word "waive"—we cannot conclude as a matter of law that the parties intended to waive their constitutional right to a jury trial on the question of attorney fees. "We cannot read words into the plain language of a contract." *Northline Excavating, Inc v Livingston Co*, 302 Mich App 621, 628; 839 NW2d 693 (2013).

Our conclusion in that regard is bolstered by the fact that Farm Bureau not only failed to argue *before* trial that Barton-Spencer had waived her right to a jury trial, but also did not move to bifurcate the trial of its counterclaims to permit a bench trial regarding the contractual attorney fees. Instead, Farm Bureau waited until *after* the jury trial to challenge Barton-Spencer's entitlement to such a trial. At that point in the proceeding, however, it was too late for Farm Bureau to make such motion. Under MCR 2.509(A), after a jury demand is made:

The trial of all issues so demanded *must be by jury unless*

(1) the parties agree otherwise by stipulation[5] in writing or on the record, or

(2) the court on motion or on its own initiative finds that there is no right to trial by jury of some or all of those issues.

Here, the parties did not make such stipulation, Farm Bureau did not file a motion challenging Barton-Spencer's right to a jury trial,[6] and the trial court never expressly found that Barton-Spencer had waived her right to a jury trial. Consequently, even assuming that the contractual language *did* waive the parties' right to a jury trial, because the parties' entitlement to a jury trial as to attorney fees was never disputed before trial took place, a jury trial was mandatory under MCR 2.509(A) regarding "all issues so demanded," including Farm Bureau's counterclaim for contractual costs and attorney fees.

Moreover, we cannot conclude that, because of the trial court's award of case evaluation sanctions, the trial court's error was harmless or that the instant issue is moot. Farm Bureau argues that, since it was entitled to its reasonable costs and attorney fees as case evaluation sanctions under MCR 2.403(O), it would have ultimately received "essentially the same" award of costs and attorney fees regardless of the trial court's contested ruling.

The case evaluation sanctions awarded by the trial court were, however, based on its conclusion about the total amount of reasonable fees incurred by Farm Bureau, less the "reasonable" costs and fees that it had already granted Farm Bureau under the terms of the agent agreement. Thus, had the reasonableness of the contractually based costs and attorney fees been decided by the jury, the final award might have been much different. Given the imprecise nature of the reasonableness inquiry, we cannot conclude that the jury would have reached the same conclusion that the trial court did about the exact amount of costs and fees that were reasonable.

## IV. CONCLUSION

Hence, we generally affirm the trial court's rulings, but we reverse its award of $49,499.06 in contractual costs and attorney fees to Farm Bureau. Because the trial court's subsequent calculation of case evaluation sanctions under MCR 2.403(O) was dependent on its deduction of "overlap" from the award we now reverse, we remand this matter to the trial court for recalculation of such sanctions. On remand, the trial court should recalculate Farm Bureau's

---

[5] Under the plain language of the court rule, the agent agreement cannot be deemed a "stipulation in writing" regarding the right to a jury trial in this action. In context, the phrase "stipulation in writing," as used in MCR 2.509(A)(1), clearly refers to an agreement, i.e., a stipulation, filed by the parties to an action on the specific issue of whether that action will be tried before a jury.

[6] On the contrary, in its answer Farm Bureau actually relied upon Barton-Spencer's jury demand to support its own right to a jury trial regarding its counterclaims.

case evaluation sanctions without considering such "overlap." We do not retain jurisdiction. Each having prevailed in part, the parties may not tax costs under MCR 7.219.

/s/ Michael J. Talbot
/s/ Kurtis T. Wilder
/s/ Jane M. Beckering